UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

        v.

QUAWEE JONES, et al,

        Defendant.

16 Cr. 181 (JLL)

---

**DEFENDANT QUAWEE JONES' MEMORANDUM OF LAW
IN SUPPORT OF HIS PRE-TRIAL MOTIONS**

---

Stacy A. Biancamano, Esq.
BIANCAMANO LAW, LLC
Cranford Executive Plaza
312 North Avenue East, Suite 7
Cranford, New Jersey 07016-2464
P: (908)325-3023
sbiancamano@biancamanolaw.com
Attorney for Defendant Quawee Jones

## PRELIMINARY STATEMENT

Defendant Quawee Jones ("Jones") respectfully submits this Memorandum of Law in support of his pre-trial motions to: 1) suppress evidence unlawfully obtained through invalid wiretaps and 2) for severance of his trial from that of his codefendants.  Jones was charged in a one-count superseding indictment with conspiracy to distribute and to possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §841(a)(1) and (b)(1)(A) and 21 U.S.C. §846.  As charged in the Criminal Complaint, Almalik Anderson ("Anderson") is the alleged leader of a heroin distribution network that controls 25 Johnson Avenue in Newark, New Jersey (hereinafter referred to as "25 Johnson").   Anderson, Jones and thirteen (13) other individuals were charged as part of the conspiracy.

The government's primary source of evidence against Jones was obtained as a result of the two wiretaps, which were defective in that they lacked probable cause and failed to meet the necessity requirements of 18 U.S.C. §2518(3)(c).  As such, the evidence obtained from these wiretaps must be suppressed.  The Court should also grant Jones' request for a pre-trial *Starks* hearing as there is a colorable challenge to the identity of the speaker recorded on the wiretap.  Under Federal Rule of Criminal Procedure 14, Jones' trial should be severed from the trial of his codefendants in order to prevent significant prejudice to Jones in this complex, multi-defendant case.  Jones also incorporates all arguments made in the Motion for Pretrial Relief filed by prior counsel on January 20, 2017 (Dkt. Entry 212).

## FACTUAL BACKGROUND

As part of the investigation into the Anderson's heroin distribution network at 25 Johnson, the government sought and obtained two separate orders for wiretaps of phones allegedly used by Anderson and Jones.  The first order was obtained on or about October 9, 2015, when the

2

Honorable Claire E. Cecchi, United States District Judge for the District of New Jersey, authorized the initial interception of wire and electronic communications to and from a cell phone used by Anderson (the "Anderson Wiretap"). In support of its application, the government submitted the affidavit of FBI Special Agent Jeffrey Kidder (the "Anderson Affidavit," attached hereto as **Exhibit A**). The Anderson Affidavit identified Anderson as "the leader of the drug organization that distributes heroin insider the first-floor hallway of 25 Johnson Avenue" since at least 2011, as well as nine other individuals allegedly involved in the distribution network. Anderson Affidavit at ¶s9(A)-(J), 14, 42.

Special Agent Kidder primarily relied on information from three confidential informants, CW1, CW2, and CW3. According CW1, "Anderson was the sole supplier of heroin to the individuals who distribute the heroin in the first-floor hallway of the building." Id. at ¶14. Heroin Distributors at 25 Johnson paid Anderson per brick of heroin, and Anderson retained the profits. Id. at ¶14-15. CW2 and CW3 also stated that Anderson controlled heroin distribution at 25 Johnson. Id. at ¶16-17. The Anderson Affidavit further stated that between February 26, 2015 and July 23, 2015, the FBI, mainly via CW2, conducted approximately 23 controlled purchases of heroin from inside 25 Johnson. Id. at ¶22. Jones was not identified as making any of these sales or being present during any of the transactions, nor was he even identified as a member of this organization in the Anderson Affidavit.

Thereafter, on or about October 29, 2015, Judge Cecchi signed a subsequent order, authorizing the initial interception of wire communications over a cell phone allegedly used by Jones (the "Jones Wiretap"). In support of its request, the government again submitted an affidavit from Special Agent Kidder (the "Jones Affidavit," attached hereto as **Exhibit B**). The Jones Affidavit essentially relied on the same information as the Anderson Affidavit, with the addition

3

of three phone calls intercepted via the Anderson Wiretap, which were allegedly conversations between Anderson and Jones on October 12, 2015. The information provided by CW1 and CW3 was also modified in that they now claimed that Jones, previously unidentified, was Anderson's "partner" in his drug distribution network.

On November 18, 2015, the government filed a Criminal Complaint in the District of New Jersey, which was premised on the information contained in the Anderson and Jones Affidavit and the resulting evidence seized from the wiretaps. With respect to Jones, the Complaint relied on the three October 12, 2015 conversations intercepted as a result of the Anderson Wiretap, as well as numerous conversations intercepted as a result of the Jones Wiretap. To date, all defendants other than Jones, Shaahid Cureton and Rashard Johnson have accepted plea offers from the government.

## LEGAL ARGUMENT

### POINT I
### THE COURT SHOULD SUPRESS EVIDENCE GATHERED AS A RESULT OF THE INVALID WIRETAPS.

The Fourth Amendment protects individuals from "unreasonable searches and seizures" and requires all warrants to issue only upon "probable cause." U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson,* 305 F.3d 164, 167 (3d Cir. 2002). Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh,* 420 U.S. 103, 111 (quoting *Beck v. Ohio,* 379 U.S. 89, 91 (1964)). This standard is meant to "'safeguard citizens from rash and unreasonable interferences with privacy'" and to provide "leeway for enforcing the law in the community's protection." *Id.* at 112 (quoting *Brinegar v.*

*United States,* 338 U.S. 160, 176 (1949)). "A search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979). "[A] person's mere propensity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* (citing *Sibron v. New York,* 392 U.S. 40, 62-63).

Searches conducted by wiretap, at issue in this matter, represent an "extraordinary investigative device." *United States v. Giordano,* 416 U.S. 505, 527 (1974). Unlike other searches governed by the Fourth Amendment, wiretaps are conducted without notice, and it places the functional equivalent of an "invisible policeman in the bedroom, in the business conference, in the social hour, at the dinner table, and in the [doctor]'s office" for weeks and months on end. *Berger v. New York,* 388 U.S. 41, 60-65 (1967) (Douglas, J., concurring). Because a wiretap, by its very nature, "sweeps in all conversations within its scope – without regard to the participants or the nature of the conversations," it "intrudes upon the privacy of those not even suspected of a crime and intercepts the most intimate of conversations." *Id.* at 65. As such, the issuance of an order for a wiretap is to be "the exception and not the rule." *United States v. Fury,* 554 F.2d 522, 530 (2d Cir. 1977). Only "special facts" showing "exigency," create a genuine need" for officials to secretly intercept private conversations. *Berger,* 338 U.S. at 60; *Dalia v. United States,* 441 U.S. 238, 250 (1979).

In pursuit of these principles, 18 U.S.C. §2510-2520 requires compliance with a specific procedural framework in order to gain judicial authorization to intercept electronic, wire and oral communications. The court must determine that:

a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense . . . ;

b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

d) there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. §2518(3)(a)-(d).  Here, evidence seized as a result of the Anderson Wiretap and Jones Wiretap should be suppressed as they lacked probable cause and the government failed to establish that traditional investigative techniques were unsuccessful.  Moreover, the Jones Wiretap, which was procured based on evidence stemming directly from the Anderson Wiretap, should be suppressed as the "fruit of the poisonous tree."

### A.     The Anderson Affidavit and the Jones Affidavit Failed To Provide Sufficient Probable Cause to Justify the Wiretaps.

The Supreme Court has set forth a "totality-of-the-circumstances" test for determining probable cause to support a search warrant. *Illinois v. Gates*, 462 U.S. 213 (1983).  The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 289. https://scholar.google.com/scholar_case?case=12877848434623819956&q=U.S.+v.+Wagner&hl=en&as _sdt=3,31The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause. *Id.* at 236.

In making this assessment, the affidavit is to be construed in its entirety and in a common sense and non-technical fashion. *Id.* at 230-231.  Importantly, "[s]ufficient information must [have

been] presented to the magistrate to allow that official to determine probable cause; his action cannot [have been] a mere ratification of the bare conclusions of others." *Id.* at 239.  Accordingly, "a mere conclusory statement" in an affidavit "that gives the magistrate virtually no basis at all for making a judgment regarding probable cause" will not suffice.  *Id.*  When the government relies on an informant to establish probable cause, as in this case, the informant's "reliability" and "basis of knowledge" are both "relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other." *Id.* at 233.

1.    **The Anderson Affidavit failed to establish the reliability and basis of knowledge of the confidential informants.**

The Anderson Affidavit lacked probable cause as it failed to establish the reliability and the basis of knowledge of the three confidential informants, as required by *Gates*.  In assessing reliability, bare assertions by the affiant that the informant is reliable does not suffice.  *United States v. Williams*, 3 F.3d 69 (3d Cir. 1993).  The court should look to factors such as the informant's history or providing reliable information through prior assistance to the government. *United States v. Dunaway*, WL 1850866 (3d Cir. 2012) (unpublished) (reliability proven because informant had provided reliable information to the police in the past); *United States. v. Wagner*, 989 F.2d 69 (2d Cir. 1993) (affidavit may be sufficiently reliable to support a finding of probable cause if the informant has a track record of providing reliable information).  Although the Anderson Affidavit relied heavily upon information provided by CW1, CW2 and CW3, there is no indication that any of the informants have cooperated with the government in previous matters or that they previously provided reliable information.  Rather, all three informants are admitted purchasers of heroin from 25 Johnson, while CW2 is a paid informant and CW3 signed a

cooperation agreement with the government. Anderson Affidavit at ¶10. As such, there is a significant deficiency in the showing of reliability,

The basis of knowledge of the informants is also severely lacking as none of them are part of the alleged distribution network. The Anderson Affidavit makes the conclusory assertion that CW1 has "first had knowledge of the Anderson drug organization going back to approximately 2011," without providing any basis for his knowledge or corroboration of any sort. *Id.* at ¶10(A). CW1 also states that Anderson has been the leader of the heroin distribution network that controls 25 Johnson and the sole supplier of heroin to the individuals who distribute it within the building. *Id.* at ¶14. Again, there is no information provided which indicates the basis of CW1's knowledge. While CW1's information was allegedly corroborated by CW2, this is of limited value as CW2 is a paid informant who only purchased heroin at 25 Johnson and did not operate as a distributor. *Id.* at ¶18. CW2 simply provided information that Anderson stands in front of 25 Johnson and was present during several heroin sales to CW2. *Id.* at ¶16. This does not corroborate the allegations offered by CW1. The information provided by CW3 is also insufficient as it is another bare assertion that Anderson is the supplier of heroin for 25 Johnson, based on the fact that Anderson owns expensive automobiles and carries designer backpack similar to the distributors at 25 Johnson. *Id.* at ¶17.

The Anderson Affidavit is devoid of reference to the source of knowledge for any of the three confidential informants. Special Agent Kidder failed to supply grand jury testimony or affidavits from the informants which proved the information provided and upon which the magistrate judge could have evaluated their credibility and reliability. The government's reliance on confidential informants is exactly the type of conclusory statement that the Court in *Gates* prohibited. The information provided was insufficient to establish that Anderson was the leader

of the heroin distribution network and thus establish probable cause to wiretap Anderson's cell phone. *Id.* at ¶16, 22. As such, all evidence obtained as a result of the Anderson wiretap should be suppressed.

### 2.   The Jones Affidavit failed to establish the reliability and basis of knowledge of the confidential informants.

The Jones Affidavit, which relied primarily on the information contained in the Anderson Affidavit, also failed to establish the reliability and the basis of knowledge of the three confidential informants, and thus lacked probable cause. Jones was not identified in the Anderson Affidavit, yet twenty (20) days later when the government submitted the Jones Affidavit, he was elevated to the status of Anderson's partner in the distribution network. Special Agent Kidder claims that three phone calls intercepted as a result of the Anderson Wiretap show that "Jones is the highest-ranking person in the drug organization other than Anderson." Jones Affidavit at ¶52. The affidavit goes on to further state that "the best way to determine Anderson's location and get the telephone number of his new facility is to intercept calls over his 'partner's' phone." *Id.* While the Jones Affidavit is premised on the allegation that Jones is Anderson's "partner" in the distribution network at 25 Johnson, there is nothing in the affidavit supports this contention, other than bare bones allegations made by CW1 and CW3.

Mirroring the Anderson Affidavit, The Jones Affidavit relies on CW1 to establish probable cause, and the affidavit again states he has "first had knowledge of the Anderson drug organization going back to approximately 2011" without providing any basis for his knowledge or corroboration of any sort. *Id.* at ¶10(A). The Jones Affidavit does not disclose where this knowledge comes from nor does it contain any evidence of past narcotics dealings between Anderson, Jones, and CW1. Any information pertaining to CW1's reliability, including his background, role in the

9

"Anderson drug organization," past history as an informant and criminal history is absent from both the Anderson and Jones Affidavits, or has been redacted from defense counsel.

Jones' alleged involvement is primarily established by statements from CW1, who changed his story twenty (20) days after the Anderson Affidavit by stating that the previously unidentified Jones is a now Anderson's "partner" in the heroin distribution network at 25 Johnson. *Id.* at ¶23. This was based on his observation of Jones standing outside of 25 Johnson while heroin buyers were being serviced a short distance away at the entrance of the building. *Id.* According to CW1, Anderson was in Atlanta for several weeks and Jones was running the day-to-day operations. The Jones Affidavit attempts to corroborate this information by a vague statement from CW3 that "Jones and Anderson are partners in the 25 Johnson heroin distribution." *Id.* at Fn. 13. The only support offered for this contention is the fact that Anderson and Jones were partners in two other businesses. *Id.* at Fn.13. These unsupported conclusions fail to explain the basis of CW1 and CW2's knowledge and are inadequate to establish probable cause with respect to Jones. Moreover, the reliability of the confidential informants remains deficient as the Jones Affidavit does not contain any additional reliability information than the Anderson Affidavit. The reliability of the informants actually becomes more suspect in the Jones Affidavit because there is no explanation why CW1 and CW3 failed to identify Jones in the Anderson Affidavit, and only twenty days later fundamentally shifted their position that Anderson was the sole supplier and leader of the distribution network by identifying Jones as Anderson's "partner."

In addition to information provided by confidential informants, the Jones Affidavit relies on three intercepted calls on October 12, 2015 between Anderson and a person alleged to be Jones, which purportedly establish that Jones is a partner in the distribution network. *Id.* at Fn. 16. Special Agent Kidder asserts that the first phone call is a discussion between Anderson and Jones

regarding another individual outside the organization who was distributing narcotics at 25 Johnson without their permission. The text of this conversation, however, reveals that this interpretation is overreaching in identifying Jones as Anderson's partner:

| | |
|---|---|
| Anderson: | I got to the bottom of that shit with "Shay." |
| Jones: | . . . Rashay? |
| Anderson: | Yeah (unintelligible) called me about giving him that "oreos." |
| Jones: | Who? |
| Anderson: | Your cousin and them. |
| Jones: | Who. "Gutta?" |
| Anderson: | Yeah |
| . . . | |
| Anderson: | I asked Crack today like, "yo, where he get that from?" Then he told me, such and such, crazy right? |
| . . . | |
| Jones: | Wow, that's why they be coming and be sitting out there and all that. |
| Jones: | I'm like, that nigga is like, he's persistent with getting that shit in the building. |

*Id.* at ¶33. While Anderson discussed heroin sales by another individual, Jones did not make any incriminating statements linking him to the sale or distribution of heroin at 25 Johnson, nor does the conversation indicate that Jones is Anderson's "partner."

Similarly, a second conversation on October 12, 2015 allegedly between Anderson and Jones fails to support the government's contention that another defendant attempted to distribute heroin at a different location without the permission of Jones and Anderson. *Id.* at ¶34.

| | |
|---|---|
| Anderson: | Man, let me tell you what the customer said. Oh yeah, Kiss and them gave me their number, they opening up another building. I said, what? (Unintelligible) opening up another building, what? He gave them his number." |
| Jones: | They tried to go around the corner and use "Cretta?" "Cretta" shut that shit down . . . I'm like them niggas trying to find somewhere in close. |
| Anderson: | Violate them. Them niggas crazy. You don't do no shit like that man. |
| Jones: | Yeah, that shit over with. |
| Anderson: | They thought we wasn't going to get to the bottom of it! |

*Id.* at ¶35.  Again, nothing in this conversation indicates that Jones was actually involved in the drug distribution network.  While the conversation is incriminating for Anderson, it does not provide sufficient information to establish probable cause as to Jones.

The final call on October 12, 2015 similarly fails to establish that Jones is Anderson's partner in the distribution network.  *Id.* at ¶37.  Special Agent Kidder asserts that this conversation was a discussion between Anderson and Jones about how another member of the network was bringing in a heroin distributor to work a shift at 25 Johnson without Anderson or Jones' permission.  *Id.*  However, the conversation actually indicates that Anderson is, in fact, the leader of the distribution network and was the individual in control of the situation described.  Special Agent Kidder essentially admits this in his summary of the conversation, wherein he states that Jones informed Anderson of the problem, but Anderson made the decision regarding the outcome of the situation.  *Id.* at ¶38.

The reliance on these recorded conversation, as well as the information provided by the confidential informants, is insufficient to establish probable cause as to Jones.  The Jones Affidavit relied on unsupported allegations and conclusions that Jones was a partner in the distribution network.  In reality, the Jones Affidavit contained minimal information that even linked Jones to the distribution network.  As such, there was a very low probability that contraband or evidence of a crime would have be found via the Jones Wiretap, and therefore suppression of any resulting conversations is warranted.

3.   **Evidence obtained from the Jones Wiretap must be suppressed as it was based on the invalid Anderson Wiretap and is thus the "fruit of the poisonous tree."**

Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion.  *Segura v. United States,* 468 U.S. 796, 804 (1984).  The exclusionary

prohibition also extends to the indirect as the direct products of an unlawful search, and as such, evidence that is "tainted" by an illegal search or considered "fruit of the poisonous tree" may also be excluded. *Wong Sun v. United States,* 371 U.S. 471, 484-485 (1963). In those cases, the court must consider whether "the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" *Segura,* 468 U.S. at 805 (citing *Nardone v. United States,* 308 U.S. 338, 341 (1939)). If the evidence is sufficiently removed from the illegality or when there is an "independent source" for the warrant, then it is not excluded. *Id.* at 813-14. Similarly, 18 U.S.C. § 2515 bars the use of the contents and fruits of illegal interceptions. *Gelbard v. United States,* 408 U.S. 41, 46 (1972).

In *U.S. v. Spagnuolo,* the Ninth Circuit applied the "fruit of the poisonous tree" in the context of evidence derived from an invalid wiretap. 549 F.2d 705 (9th Cir. 1977). The initial wiretap was ruled illegal and the evidence taken from it was later suppressed because it was devoid of any facts that would have allowed a judge to determine there was probable cause. *Id.* The court found that summaries of conversations intercepted during the initial wiretap formed the essence of the probable cause allegations in the subsequent wiretaps, and therefore the evidence obtained from the subsequent wiretaps should also be dismissed. *Id.* Moreover, the court found that conversations intercepted under the original wiretap revealed the connection to the criminal activity of the telephone numbers targeted in the subsequent wiretaps. *Id.*

Here, evidence obtained from the Anderson Wiretap must be suppressed as it was neither supported by probable cause nor did not meet the necessity requirement of 18 U.S.C. §2518(3)(c). This includes the three conversations on October 12, 2015, which were allegedly between Anderson and Jones and were subsequently the basis for the Jones Wiretap. The Jones Affidavit relied on these conversation in establishing probable cause, and without these conversation, there

would have been an insufficient basis to grant the wiretap order. Similarly, the evidence derived from the Anderson Wiretap revealed the telephone number targeted in the Jones Wiretap. Jones Affidavit at ¶32.

The Anderson Wiretap was absolutely essential in the application for the Jones Wiretap, and it is not "so attenuated as to dissipate the taint.'" *Segura,* 468 U.S. at 805. As such, all evidence from the Jones Wiretap must be suppressed. To the extent that information gathered as a result of the Jones Wiretap was essential to the probable cause showings of the affidavits for any warrants that followed, those subsequent warrants must be held to be fatally tainted as well.

**B.      The Anderson and Jones Affidavits Fail To Meet The Necessity Requirements of 18 U.S.C. § 2518(1)(c).**

Pursuant to 18 U.S.C. § 2518(1)(c), an application for interception of a wire, oral or electronic communication must include " full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Before approving a wiretap, the issuing court must satisfy itself that traditional law enforcement methods are unlikely to succeed or are too dangerous to attempt. 18 U.S.C. § 2518(3)(c). "The government must lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient," which is tested in "a practical and common sense fashion." *United States v. Williams,* 124 F.3d 411, 418 (3d Cir. 1997) (citing *United States v. McGlory,* 968 F.2d 309, 345 (3d Cir. 1992) (citations omitted)). Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. *United States v. Armocida,* 515 F.2d 29, 37 (3d Cir. 1975), *cert. denied,* 423 U.S. 858 (1975). The purpose of the necessity requirement is to ensure that wiretapping is not

resorted to in situations where traditional investigative techniques would suffice to expose the crime. *United States v. Kahn,* 415 U.S. 143, 153 n. 12 (1974).

The Anderson Affidavit, in advancing necessity, relied on the fact that it had used traditional investigatory devices such as confidential informants, pole surveillance, and physical surveillance with varying degrees of success. *Id.* at ¶s 49, 54, 65. Special Agent Kidder maintained that the remaining techniques such as undercover agents, tracking devices, grand jury subpoenas, and search warrants would be ineffective. *Id.* at ¶s 47, 57, 59, 63. The Anderson Affidavit relied on stock phrases that these other techniques would be insufficient, without sufficient proof that they would not yield the desired results or would otherwise be too dangerous.

Necessity is particularly lacking with respect to the Jones Wiretap. The affidavit does nothing more than repeat the conclusions in the Anderson Affidavit, essentially "piggy-backing" on that information without providing current information regarding the investigative techniques utilized in connection with the investigation into Jones. The Anderson Affidavit was completely devoid of reference to Jones, therefore there is no indication that the government attempted a less intrusive investigation tool on Jones. This fails to satisfy the necessity requirement of 18 U.S.C. § 2518(3)(c) as it must specifically relate to the individual targeted in the wiretap. See *United States v. Brone*, 792 F.2d 1504 (9th Cir. 1986) (holding that necessity requirement must be satisfied separately in each successive application and must be unique to the telephone number and each individual to whom the wiretap in directed); *United States v. Castillo-Garcia*, 117 F.3d 1179 (10th Cir. 1997) (statements made in the application must be factual in nature and they must specifically relate to the individuals targeted in the wiretap).

Specifically, the Jones Affidavit claims that surveillance would be futile as the surveillance was difficult at 25 Johnson and cameras installed at the site were destroyed. Jones Affidavit at

¶60. However, Special Agent Kidder cites to surveillance on 25 Johnson that was conducted between February 2015 and July 2015, several months before it applied for the Jones Wiretap and well before Jones was even identified as a suspected member of Anderson's distribution network. There is no indication that additional surveillance was conducted after Jones became an individual of interest. Similarly, the Jones Affidavit claimed that tracking would be futile because the government could not ascertain which vehicle *Anderson* drove on a given day. *Id.* at ¶63. The government then stated that "no information regarding vehicles used by Jones has been discovered" without detailing the methods used, if any, to identify Jones' vehicle for tracking purposes. *Id.* Physical surveillance and/or tracking, in particular, could have proven beneficial in this case as the government admits in the Anderson and Jones Affidavits that it was trying to determine where Anderson lived and source of his supply his distribution center. If Jones is Anderson's alleged partner, then physical surveillance/tracking of Jones should have been conducted to ascertain the location of the heroin supply and/or Anderson.

The Jones Affidavit also specified that search warrants had been considered, but that law enforcement had not developed sufficient information to issue a search warrant for any of the apartments in 25 Johnson and no solid evidence exists as to Anderson's residence. *Id.* at ¶69. Again, this fails to provide any information regarding the use of search warrants directed towards Jones. While the government was not able to ascertain where Anderson lived, there is no indication that they did not know where Jones lived. As such, this could have been a less intrusive investigatory tool which the government chose to bypass.

By simply copying the information contained in the Anderson Affidavit, Special Agent Kidder misled the issuing court into believing that that the government had used all traditional methods of investigation. The Jones Affidavit was submitted only 20 days after the Anderson

Affidavit, and only 17 days after the October 12, 2015 conversations where Jones was allegedly recorded.   It is unlikely that the government sufficiently engaged in traditional investigative techniques *with respect to Jones* during this short period of time.   Rather, the government sought to circumvent this stage and immediately resort to a wiretap.   This is impermissible under 18 U.S.C. § 2518(3)(c) and warrants suppression of the evidence gained as a result of the Jones Wiretap.

### POINT II
### THE COURT SHOULD CONDUCT A *STARKS* HEARING TO DETERMINE THE IDENTITY OF THE SPEAKER RECORDED ON THE JONES WIRETAP

The Court must conduct a *Starks* hearing to determine the admissibility of conversations recorded as a result of the Jones Wiretap as the government has failed to establish that Jones was the user of the cell phone at issue (Target Facility 2) and thus the voice heard on the recordings. In *United States v. Starks,* the Third Circuit held that "[w]hen a colorable attack is made as to a tape's authenticity and accuracy, "the burden is on the government to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings" 515 F.2d 112, 122 (3d Cir. 1975) (citations omitted).   In order to prove accuracy and authenticity, the government must show: (1) the capability of the recording device to capture the conversation to be offered into evidence; (2) the ability of the operator to use the device competently; (3) the recording appears to be or is authentic and correct; (4) that changes, additions or deletions have not been made; (5) that the recording properly has been preserved; (6) the speakers are identified; and (7) the conversation elicited appears to have been made voluntarily and in good faith, and without any kind of inducement. *Id.* at n.11.

Here, there is significant doubt as to the identity of the individual recorded on Target Facility 2, as Special Agent Kidder admitted that it was unable to conclusively identify it as Jones.

In the Jones Affidavit, Special Agent Kidder acknowledges that "no definitive identification has been made of the voice heard over Target Facility 2 and because of the difficulty of surveillance, as detailed below, *no positive identification of Jones using Target Facility 2 has been made*." Jones Affidavit at fn. 16 (emphasis added). As such, Jones is entitled to a pre-trial *Starks* hearing wherein the government is required to prove the identity of the speakers on the recordings. If it fails to do so, the recordings are subject to suppression.

## POINT III
## JONES' TRIAL SHOULD BE SEVERED FROM THE TRIAL OF HIS CODEFENDANTS TO AVOID SIGNIFICANT PREJUDICE.

Pursuant to Federal Rule of Criminal Procedure 14, Jones is entitled to a severance of his trial from that of his codefendants Shaahid Cureton and Rashard Johnson. The Rule provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. Pro. 14. Although judicial economy favors a joint trial where defendants are jointly indicted and charged in a single conspiracy, a joint trial is not an absolute requirement. *United States v. Simmons*, 679 F.2d 1042, 1051 (3d Cir. 1982). As such, the defendant may establish a valid reason for severance. *United States v. Sandini*, 888 F.2d 300, 305 (3d Cir. 1989).

It is well established that the court must sever trials of defendants where a joint trial would lead to a clear and substantial prejudice resulting in a manifestly unfair trial. *United States v. Lore*, 430 F.3d 190, 204-05 (3d Cir. 2005). Accordingly, a court should grant severance under Fed. R. Crim. Pro. 14 "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Such a risk might occur "when evidence that the jury should not consider against a defendant and that would not be admissible if

a defendant were tried alone is admitted against a codefendant." *United States v. Balter*, 91 F.3d 427, 432-433 (3d Cir. 1996) (quoting *Zafiro*, 506 U.S. at 539). Specific examples in which this might take place include: (1) "a complex case" involving "many defendants" with "markedly different degrees of culpability," (2) a case where evidence that is probative of one defendant's guilt is technically admissible only against a co-defendant, and (3) a case where evidence that exculpates one defendant is unavailable in a joint trial. *Id.* (citing *Zafiro*, 506 U.S. at 539). The inquiry is whether the jury can reasonably be expected to compartmentalize the prejudicial evidence in light of the quantity and limited admissibility of the evidence. *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991).

Here, a joint trial will prejudice Jones as this is a complex case involving multiple defendants and involving significant evidence derived from multiple wiretaps. The defendants have varying degrees of culpability and admission of countless transcripts pertaining to events that Jones was not involved in will result in significant prejudice. The jury cannot be expected to compartmentalize this unrelated evidence. Accordingly, severance is warranted.

## CONCLUSION

For the reasons set forth above, Defendant Quawee Jones respectfully requests that the Court: 1) suppress evidence unlawfully obtained through invalid Anderson Wiretap and Jones Wiretap; 2) order a severance of Jones' trial from the remaining defendants; 3) grant a pre-trial Starks hearing; and 4) grant all other relief requested in prior counsel's January 20, 2017 Motion for Pretrial Relief. (Dkt. Entry 212).

BIANCAMANO LAW, LLC
Attorneys for Defendant Quawee Jones


By:   s/ Stacy A. Biancamano
      Stacy A. Biancamao, Esq.

19